Rel: March 7, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2024-0220

_____

## Jeffrey A. Fraiser

## v.

## Taylor K. Nahrstedt

## Appeal from Elmore Circuit Court
## (DR-22-900073)

EDWARDS, Judge.

Jeffrey A. Fraiser ("the father") appeals from an amended judgment entered by the Elmore Circuit Court ("the trial court") that, among other things, adjudicates him to be the biological father of A.K. ("the child"), awards Taylor K. Nahrstedt ("the mother") and the father joint legal

custody of the child, awards the mother sole physical custody of the child, establishes a parenting plan, and awards the mother monthly child support and retroactive child support. We affirm the trial court's judgment in part, reverse the judgment in part, and remand the case to the trial court.

## Procedural Background

On April 13, 2022, the mother filed in the trial court a petition seeking custody of the child. The mother alleged, among other things, that the child, whose date of birth is January 17, 2020, had been born out of wedlock to the mother and the father. On May 12, 2022, the father filed an answer to the mother's petition.

On May 25, 2022, the father filed, in the trial court, a motion seeking the recusal of Judge Sibley Reynolds, who had been assigned the case. As the basis for his request, the father asserted that, in a previous case, it had been alleged that he had threatened Judge Reynolds. The father also asserted that the alleged threat had been presented to an Elmore County grand jury, which, he said, had "no billed" the case. Also, on May 25, 2022, the father filed in the trial court a motion seeking the

disqualification[1] of the mother's attorney because, he said, the mother's attorney had, in 2021, gained "intimate details" of the father's business relationships and income when he had represented the father in an unrelated civil matter. On May 25, 2022, Judge Reynolds entered an order recusing himself from the parties' custody action.

On July 1, 2022, the mother filed a response to the father's motion seeking the disqualification of her counsel. In her response, the mother objected to the disqualification of her counsel and disputed the father's assertion that her counsel had previously represented the father. She did, however, concede that her counsel had written a letter on the father's behalf to the father's brother regarding a "totally unrelated civil matter" but that, thereafter, the father had not retained the attorney to represent him.

On July 19, 2022, the father filed a motion seeking the appointment of a substitute trial judge and a hearing on his motion to have the

---

[1]Although the father's motion requested the "recusal" of the mother's attorney, that request was, in effect, a motion seeking the disqualification of the attorney. See Ex parte Thacker, 159 So. 3d 77, 79 (Ala. Civ. App. 2014) (generally explaining that attorneys may be disqualified from representation and that a trial judge may be required to recuse from an action).

mother's counsel disqualified. In his motion, the father asserted that in the two months since Judge Reynolds's recusal, no judge had been assigned to the pending custody case. The following day, July 20, 2022, an order was entered reassigning the case to circuit-court judge Ben Fuller.[2]

On October 4, 2022, Judge Fuller entered an order scheduling all pending motions for a hearing to occur on November 4, 2022. Further, Judge Fuller's order provided that "Joy P. Booth, Special Circuit Judge," would preside over the November 4, 2022, motion hearing. Thereafter, on October 11, 2022, Judge Fuller, in his capacity as the presiding judge of the Nineteenth Judicial Circuit, entered an order transferring the case to Judge Booth.

On October 20, 2022, Judge Booth entered an order, ex mero motu, rescheduling the motion hearing for November 1, 2022. On October 30, 2022, the Judge Booth entered an order that, among other things, ordered the mother's counsel to seek a written opinion from the Alabama State Bar regarding his potential conflict in representing the mother and

_____

[2]Judge Ben Fuller retired effective January 16, 2023.

to submit that opinion to the trial court; she also canceled the November 1, 2022, motion hearing.

On May 16, 2023, the mother filed in the trial court a motion seeking the immediate return of the child. In her motion, the mother alleged, among other things, that the parties had informally agreed to a pendente lite visitation schedule and that the father had failed to return the child at the end of his agreed-upon visitation period. That same day, Judge Booth granted the mother's motion and ordered that the child be immediately returned to the mother's care. On June 13, 2023, Judge Booth entered an order, ex mero motu, that, among other things, appointed a guardian ad litem ("the guardian ad litem") to represent the interests of the child.

On June 16, 2023, the father filed a counterpetition in which he sought, among other things, an adjudication of the paternity of the child and an award of joint legal and joint physical custody of the child. On June 19, 2023, the mother filed an answer to the father's counterpetition. On September 1, 2023, the father's counsel filed a motion to withdraw; that motion was granted the same day. On September 5, 2023, Judge Booth conducted a status conference and entered an order that, among

other things, noted that the father had appeared at the status conference, pro se; ordered the father to pay to the mother $743 per month in pendente lite child support; ordered the father to pay to the mother $2,229 in retroactive child support within 14 days; and scheduled the trial for November 7, 2023.

On September 19, 2023, new counsel for the father filed a notice of appearance. On September 25, 2023, the father filed a motion for a pendente lite hearing. On September 28, 2023, Judge Booth entered an order scheduling a pendente lite hearing to take place on October 3, 2023, before an appointed special master. A pendente lite hearing was conducted on October 3, 2023, and, on October 10, 2023, an order was entered that, in pertinent part, noted that the parties had negotiated a pendente lite agreement pursuant to which the father was awarded visitation with the child on alternating weeks from Friday through the following Tuesday.

On October 11, 2023, the father filed a motion seeking the recusal of Judge Booth and a transfer of the case to another circuit-court judge. In his motion, the father again cited his alleged threat against Judge Reynolds in 2019 as the basis for the request. Further, in his motion, the

6

father asserted that, following the alleged 2019 threat, each of the circuit-court judges in the 19th Judicial Circuit had recused from the previous case, which, he said, had resulted in Judge Donald McMillan, Jr., a circuit-court judge in Dallas County, being appointed to preside over the previous case. As additional basis for his motion, the father asserted that the mother's stepfather had been employed as a juvenile probation officer in Elmore County for a number of years.

On October 11, 2023, the father filed a motion seeking the disqualification of the guardian ad litem and requesting that a new guardian ad litem be appointed for the child. In support of his motion, the father asserted that, at a mediation that had occurred in June 2019, the guardian ad litem currently serving on the case had disclosed that she had a "close friendship" with the mother; that the child and the guardian ad litem's child were "best friends"; and that the mother had coached the athletic team of a daughter of the guardian ad litem. The father also alleged that he had notified his previous counsel of the guardian ad litem's potential conflict at the time of the guardian ad litem's disclosure.

7

On October 12, 2023, the guardian ad litem filed a response to the father's motion requesting that Judge Booth recuse herself and that the case be transferred to another judge; she also filed a response to the father's motion for her disqualification. The guardian ad litem disputed the father's assertion that she had disclosed that she and the mother have a close relationship. She also asserted that, on June 15, 2023, two days after she had been appointed to the case, she had sent an e-mail to the father's first attorney and the mother's counsel to inform them that she had a "loose association" with the mother's older child and asking both attorneys to notify her if either party wished for her to decline the appointment. According to the guardian ad litem, on June 16, 2023, she had again e-mailed the father's counsel and had provided a second opportunity for him to object to her appointment as the guardian ad litem. Further, according to the guardian ad litem, during the time that the father had been acting pro se, she had exchanged five e-mails with the father. In her motion, the guardian ad litem asserted that, despite her efforts to address any potential conflict, no party had objected to her appointment. The guardian ad litem did, however, concede that the

8

mother was one of four coaches of a cheerleading squad and that the guardian ad litem's daughter had been a member of that squad.

On October 18, 2023, the mother filed separate responses to the father's motion for recusal and to transfer the case and to the father's motion for the appointment of a new guardian ad litem. Regarding the father's request that Judge Booth recuse herself from the case, the mother objected to the father's motion as having been untimely filed and asserted that the request was merely a delay tactic that had been filed one year after Judge Booth's appointment and one month before the scheduled trial date. Regarding the father's request for the appointment of a new guardian ad litem, the mother "adopt[ed] and incorporate[ed]" the guardian ad litem's response to the father's request and generally objected to the requested relief.

On October 24, 2023, Judge Booth entered an order denying the father's motion to recuse and to transfer and the father's motion for the appointment of a new guardian ad litem. The father subsequently filed a motion to reconsider those rulings, which was denied on November 3, 2023.

9

On November 6, 2023, the father filed a petition for the writ of mandamus with this court seeking a writ directing Judge Booth to recuse. On that same date, this court denied the father's petition by order. See Ex parte Fraiser (No. CL-2023-0786, Nov. 6, 2023).

Following several continuances, the trial was eventually commenced on November 7, 2023. However, during the trial, the father's counsel suffered a medical issue that required her to seek immediate medical attention. On the father's motion, the trial was scheduled to resume on November 27, 2023.

Following the resumption and conclusion of the trial on November 27, 2023, the trial court entered a judgment on December 1, 2023, that, in pertinent part, awarded the parties joint legal custody of the child; awarded the mother "primary physical custody" of the child;[3] ordered that both parents have "equal rights and responsibilities for major decisions concerning the child, including, but not limited to, the education of the child, health care, and religions training"; awarded the

_____

[3]"Such an award is properly termed an award of 'sole physical custody' of a child. § 30-3-151(5), Ala. Code 1975." Ja.T. v. N.T., 353 So. 3d 558, 559 n.1 (Ala. Civ. App. 2021).

father "custodial time" every other Thursday through the following Tuesday, overnight visitation to occur on the Tuesday evening of his off week, specific holiday visitation, and alternating weekly custodial time during the summer; ordered the father to pay to the mother $1,102 per month in child support; and denied all other requested relief.

On December 12, 2023, the father filed a verified postjudgment motion. In his motion, the father asserted that, because the judgment awarded him custodial time approximately 14 days per month during the school year and equal time during the summer, the award was actually an award of joint physical custody. Regarding the child-support award, the father asserted that the trial court had erred in calculating his self-employment income by not deducting ordinary and necessary business expenses from his gross receipts to determine his monthly gross income and by failing to apply the "new 2023 joint custody calculations." Lastly, the father requested that the custodial periods be modified to award him custodial time from every other Friday through the following Wednesday and Tuesday overnight custodial time on his off week.

On December 28, 2023, the mother filed a postjudgment motion to alter, amend, or vacate the judgment and for sanctions. In her motion,

11

the mother argued, in pertinent part, that the trial court had failed to take into consideration the father's acts of domestic violence directed at her in determining the father's custodial time; that the father's custodial schedule was "extremely disruptive" to the child, and that the holiday schedule needed to be revised. The mother also asserted that the trial court had erred by denying the mother's request for retroactive child support.

Following a hearing on both parties' postjudgment motions, the trial court, on February 13, 2024, entered an amended judgment that, in pertinent part, maintained the award of joint legal custody; modified the custody provision to describe the custodial award to the mother as sole physical custody; awarded the mother final decision-making authority for "major decisions such as education, health care, extracurricular and religion"; modified the father's visitation periods to alternating weeks from Friday through the following Tuesday; maintained the previous $1,102 monthly child-support award; awarded the mother $6,612 in retroactive child support to be paid within 45 days; and denied all other requested relief. The father filed a timely appeal to this court.

12

The Evidence

The father testified that he and the mother had previously been in a dating relationship that had resulted in the birth of the child on January 17, 2020. The father was present at the hospital when the child was born, and he is listed as the child's father on her birth certificate. According to the father, he and the mother had begun to experience relationship issues in November or December 2020 and, he said, their relationship had ended in April 2022.

The father lives in a four-bedroom, five-bath home Wetumpka. The monthly mortgage on the father's home is $2,980. He admitted that, before she filed her petition for custody in April 2022, he had not provided any financial assistance to the mother for the benefit of the child. According to the father, his first child-support payment to the mother had occurred in September 2023, when, he said, he had paid the mother four months of pendente lite child support.

The father testified that he had retired in September 2018 when he sold his automobile-collision business to his brother. As part of the sale, the father retained ownership of a building ("the building") that had housed the former business. According to the father, since he had retired,

13

he had restored several automobiles and had subsequently sold them. On cross-examination, the father clarified that he had not sold any automobiles in the two years immediately preceding the trial. He did, however, admit that he had repaired a boat in April 2022 and that he had been compensated for that work.

According to the father, at the time of trial, the building was being rented for $6,500 per month and, he said, he was receiving an additional $300 per month in rental income from Lamar Advertising for a billboard sign located on the property. He testified that his expenses associated with the building included a $3,750 monthly mortgage payment, approximately $4,600 per year for property taxes, and between $2,500 and $2,700 per year for flood-insurance premiums.

The father admitted that he had been questioned regarding alleged threats that he had made to Judge Reynolds when Judge Reynolds had been presiding over an unrelated custody case. According to the father, the father had participated in a grand-jury investigation into his alleged threats and, he said, the grand jury had "no billed" the case. The father testified that, despite the allegations that he had threatened Judge Reynolds, he had been awarded, and, at the time of

14

trial, was exercising, alternating weekly custodial periods with the child who was the subject of the previous, unrelated custody case.

The father denied that he had ever threatened the mother. He, however, admitted to an incident that had occurred between him and the mother during which he had discharged a firearm. According to the father, on that occasion, the mother had been at his home and had gotten upset when she discovered that he had received several text messages from another woman. He explained that, as the mother was loading her automobile to leave the father's home, she indicated that she had damaged two of the father's automobiles. The father testified that, when he checked the automobiles, he had not found any damage, but, he said, the mother had indicated that the damage was not easy to find. Thereafter, according to the father, the mother had refused to leave his property as he had requested, so, he said, he discharged his firearm into the ground. He denied that the mother had been placed in any danger because he had not fired the gun in her vicinity. Also, according to the father, the mother had returned to his home two days after that incident, and the child had resumed visiting a day or two after the mother had

15

returned. He admitted that his actions had not been an appropriate response to the situation.

The father testified that, since the child's birth in 2020, he had seen the child every other day, if not daily. That frequent contact, however, had waned, he said, when the mother filed her petition for custody. According to the father, after the mother filed her custody petition, the periods between his visits with the child had "started stretching out to weeks at a time." He opined that the reduction in his visitation was attributable to the mother's pending petition. Further, he testified that he had encountered difficulty when trying to speak with the child when the child was in the mother's care. He stated that, following the entry of the pendente lite order, there had been four or five occasions on which his daily telephone call with the child had been denied by the mother.

The father expressed concerns for the mother's ability to parent the child. He generally questioned the child's safety in the company of the individuals with whom the mother associated. When questioned why he had not raised his concerns regarding the mother's social circle earlier, he clarified that those concerns had followed his receiving new

16

information during the pendency of the case and that he had shared those concerns with his counsel.

Regarding the mother's physical health, he said that the mother had previously told him that she was suffering from a brain tumor and that, on June 15, 2019, he had received a text message from her informing him that her tumor had shrunk. According to the father, he had not received any update from the mother on her brain tumor, so, he said, he was unsure if that was on ongoing medical issue at the time of the trial.

Regarding the mother's mental health, the father testified that, on April 27, 2019, the mother had sent him a text message in which she had threatened to commit suicide. The father also expressed concern for the mother's alcohol consumption, which, he said, was excessive. According to the father, the mother had continued to consume alcohol during her pregnancy and his attempts to stop that behavior had been unsuccessful.

The father testified that he has two other children and that he had, either by agreement or by court order, exercised equal parenting time with those children. He requested that he be awarded joint legal and

joint physical custody of the child and that the parties equally divide the child's expenses.

Taylor Nickels testified that she had met the mother in 2021 when she and the mother were coworkers at Cracker Barrel. According to Nickels, she and the mother had become friendly and had traveled together. Nickels testified that, in July 2021, she, the mother, the father, and several other individuals had traveled to Panama City where, she said, she had observed the mother purchase the father's meals and pay for the hotel room.

According to Nickels, after returning home from that trip, she had been out running errands and had received a text message from the mother that had stated: "I need you." Upon arriving at the mother's home, Nickels said that she had located the mother sobbing while talking on the telephone with the father. According to Nickels, she had overheard the father tell the mother that it was her fault that she had gotten pregnant and that she would have to deal with the consequences herself. Also, according to Nickels, she had overheard the father threaten to "pour a bottle of vodka down [the mother's] throat, take her to the canal, push her in, and that if anybody asked, he would say I guess she

18

just got drunk and drowned." Nickels confirmed that she had not seen similar behavior from the father during the Panama City trip.

Nickels denied that she had ever seen the mother drunk while parenting the child and denied that she had ever seen the mother use illegal drugs. She opined that the mother was a "really good mom." Regarding her observations of the father's and the child's interactions, Nickels confirmed that she had never seen the father angry, acting rude, or yelling at the child. Nickels opined that the father had been attentive and loving to the child and that the father was "absolutely" a good dad.

The mother testified that, excluding a year that she had resided in Prattville, she had resided with her mother and her stepfather in their four-bedroom, two-bath home for the approximately six-year period immediately preceding the trial. According to the mother, the child and the child's older half-sibling share a bedroom.

At the time of the trial, the mother was employed by Cracker Barrel, where she had worked as a server for approximately eight years. She reported that her work hours are Monday through Friday from "8:00 [a.m.] or 9:00 [a.m.], to 2:00 [p.m.] or 3:00 [p.m.]." According to the mother, her tips varied but, she said, she earned approximately $2,881

per month in gross income from her employment. In addition to her employment income, the mother testified that she also received food stamps. According to her, she had used her food-stamp benefits to purchase food for the father on more than one occasion. Regarding the father's employment status, the mother testified that she was "not 100% sure" whether he continued to work on automobiles, but, she said, she assumed that he did. She asked that she be awarded a "minimum" of $1,102 per month in child support and that the child-support award be retroactive to the date of the filing of her custody petition.

The mother testified that the child was in a K-3 daycare program provided by the Holtville Child Development Program. According to her, the child's daycare program had its own curriculum to prepare the children for kindergarten. She expressed concern that the father had, at times, failed to take the child to the daycare on the Mondays that he had had the child for his vitiation. According to the mother, she had discussed her concerns with the father, who, she said, had responded, on different occasions, that the child had not attended daycare due to illness, that he had wanted to spend more time with the child, and that he and the child

20

had traveled to the beach. The mother said that she had brought her concerns to the attention of the guardian ad litem.

The mother disputed the father's testimony regarding his visitation with the child before the mother filed her custody petition. According to her, the father had seen the child two or three times a week and not daily or every other day as the father testified. Further, according to the mother, before she filed her petition, she and the child had stayed overnight with the father on approximately 20 occasions but, she said, the father had never exercised an overnight visit alone with the child. The mother also testified that, until February 2023, the father had "[v]ery rarely" visited the child. She said that, at that time, by agreement, the father had begun to exercise visitation every week from Friday through Sunday but that the schedule had later been modified such that the father's visitation ended on Mondays.

Regarding the father's discharging of the firearm, the mother testified that, on that day, she had gone through the father's cellular phone and had discovered that he had been texting another woman. The mother stated that, upon discovering those text messages, she had informed the father that she was leaving his home. She admitted that

she had been angry at that time and that she had told the father that she had "put a dent in one of his vehicles and good luck finding it." According to the mother, thereafter, the father had followed her out of the house while carrying a firearm. Once outside, she said, the father had pointed the gun at her, had discharged the firearm, and had then shattered the windshield of her automobile by striking it with the firearm.

The mother denied that she had actually damaged either of the father's two automobiles and admitted that her falsely claiming to the father that she had damaged his automobiles had been "mean and petty." According to the mother, she had completed a police report with the Elmore County Sheriff's Office regarding the incident, but, she said, she had not pressed charges against the father. She denied that the father had threatened her to get her not to press charges but, she said, she had been scared that he would harm her if she pressed charges against him. She was unable to recall whether she had returned to the father's home the following Monday as testified to by the father, but she admitted that the father had replaced her windshield the Monday following the incident, that the father had apologized for the incident, and that the

22

parties had continued a dating relationship thereafter, which had resulted in her becoming pregnant with the child.

The mother denied that she had consumed alcohol while pregnant with the child. In fact, she denied that she had ever been intoxicated while pregnant with either of her children. She also denied that she had ever used drugs.

Regarding her alleged relationship with the guardian ad litem, the mother admitted that she had known the guardian ad litem before she was appointed to serve in this case, but she denied that the guardian ad litem had ever been to her home, that the two had ever been shopping together, or that she and the guardian ad litem had ever been out to dinner together. According to the mother, before the guardian ad litem was appointed to serve in this case, the only contacts between the two had consisted of one conversation that had occurred at the guardian ad litem's child's birthday party that the mother's eldest daughter had attended and interactions between the two that had occurred when the mother had coached one of the guardian ad litem's children as part of the Holtville Youth League.

The mother testified that she had experienced complications in her pregnancy that had resulted in the child's being born with heart issues and hip dysplasia. Following her birth, the child's medical issues had required frequent medical care at Children's Hospital in Birmingham and with a cardiologist in Montgomery. According to the mother, for the first year of the child's life, she had informed the father of the child's medical appointments, but, she said, the father had not attended any of those appointments. At that time, according to the mother, the father had been questioning the child's paternity. She denied that she had told the father that he was not the biological father of the child.

By the second year of the child's life, the mother said, the child's medical appointments had slowed in frequency. According to her, at that time, the child was required to visit her orthopedist and cardiologist every three months. The mother testified that, despite the decline in frequency, the father had failed to attend any of the child's medical appointments during that time.

At the time of trial, the child was almost four years old and was required to visit her orthopedist and cardiologist once per year. According to the mother, the father's involvement with the child's

24

medical appointments had consisted of his taking the child to an eye doctor's appointment at the end of 2020 or the beginning of 2021 and his taking the child to a medical appointment during the pendency of the action.

Regarding the father's alleged previous threats directed toward Judge Reynolds, the mother testified that the father had told her that he had threatened to kill Judge Reynolds, as well as several other individuals, because, he had said, they had taken custody of the child who was the subject of that action from him. Further, according to the mother, at that time, the father had told her that he had intended to use a gun with a silencer.

When questioned why she had not ended her relationship with the father, the mother testified that she had just gone through a custody matter with her eldest daughter whose father was not active in that child's life and that she did not want the child to "go without seeing her father." According to the mother, she had been willing to assume the risk to her safety and ignore the father's threats because, she said, the father was a "good dad" who was good to the child.

The mother requested that she and the father be awarded joint legal custody and that she be awarded sole physical custody of the child. Regarding the father's visitation, the mother requested that he be awarded visitation every other week commencing after school on Fridays until the following Tuesday morning, as well as specified holiday visitation periods. Regarding child support, the mother testified that, at the time of trial, the father was paying $743 per month in child support and that, by October of 2023, he had paid a total of five months of child support, which, according to her, totaled $3,715.

The mother denied that she had ever suffered from a brain tumor and denied that she had ever threatened to commit suicide. She testified that she had no idea where either of those allegations had come from.

<u>Analysis</u>

The father first argues that Judge Booth erred when she failed to recuse herself from the case because, he says, there was evidence indicating that that Judge Booth's impartiality might reasonably be questioned.

> "A trial judge's ruling on a motion to recuse is reviewed to determine whether the judge exceeded his or her discretion. See <u>Borders v. City of Huntsville</u>, 875 So. 2d 1168,

26

1176 (Ala. 2003). The necessity for recusal is evaluated by the 'totality of the facts' and circumstances in each case. [Ex parte City of] Dothan Pers. Bd., 831 So. 2d [1, 2 (Ala. 2002)]. The test is whether ' "facts are shown which make it reasonable for members of the public or a party, or counsel opposed to question the impartiality of the judge." ' In re Sheffield, 465 So. 2d 350, 355-56 (Ala. 1984) (quoting Acromag-Viking v. Blalock, 420 So. 2d 60, 61 (Ala. 1982))."

Ex parte George, 962 So. 2d 789, 791 (Ala. 2006).

The father argues that, in 2019, he had been involved in litigation regarding the custody of another child and that, during that litigation, events had transpired that had required all the circuit-court judges in the 19th Judicial Circuit to recuse themselves. According to the father, at that time, Judge Booth was a district judge who had worked for many years with the circuit-court judges who had recused themselves. In his brief to his court, the father does not discuss the specifics of the 2019 "events" but surmises that all the judges that are currently serving in the 19th Judicial Circuit are "too closely related to the events that occurred in 2019 to hear this matter with no prejudices due to their professional relationships." The father's brief, p. 6.

Evidence adduced at trial regarding the 2019 events established that the father had allegedly threatened Judge Reynolds, who, at that

27

time, was presiding over the father's custody action involving one of the father's other children. As argued by the father, the alleged threat had resulted in Judge Reynolds and the other then-serving circuit-court judges of the 19th Judicial Circuit recusing themselves. In her brief to this court, the mother argues, among other things, that the father waived the issue of Judge Booth's recusal by not timely asserting his claim regarding Judge Booth's alleged bias. Specifically, the mother argues that the father's motion seeking Judge Booth's recusal was untimely because it was filed one year after her appointment to the case and one month before the trial.

In Ex parte Parr, 20 So. 3d 1266 (Ala. 2009), our supreme court considered a similar argument regarding the alleged waiver of the issue of a judge's recusal. In Parr, a defendant in a pending civil action petitioned our supreme court for a writ of mandamus directing the trial judge in that case to grant her motion seeking the judge's recusal, which request had been made 14 months after the commencement of the action and almost 3 weeks after the entry of a scheduling order. 20 So. 3d at 1267-68. Our supreme court noted that, in Price v. Clayton, 18 So. 3d

370, 376 (Ala Civ. App. 2008), this court had stated the principles applicable to a waiver of the issue of a judge's recusal:

> "'A motion to recuse "should be filed at the earliest opportunity because 'requests for recusal should not be disguises <u>for dilatoriness on the part of the [moving party]</u>.'" <u>Johnson v. Brown</u>, 707 So. 2d 288, 290 (Ala. Civ. App. 1997) (quoting <u>Baker v. State</u>, 52 Ala. App. 699, 700, 296 So. 2d 794, 794 (Ala. Crim. App. 1974)). The issue of recusal may be waived if it is not timely asserted. <u>Knight v. NTN-Bower Corp.</u>, 607 So. 2d 262, 265 (Ala. Civ. App. 1992).'
>
> "See also <u>Ross v. Luton</u>, 456 So. 2d 249, 255 (Ala. 1984) ('The disqualification of a trial judge for interest or prejudice may be waived if the parties proceed to trial without objection.'). Accord, 46 Am. Jur. 2d <u>Judges</u> § 208 ('An untimely objection or motion to disqualify a judge waives the grounds for recusal. The reason for this rule is to prevent litigants from waiting to see whether they win, and if they lose moving to disqualify the judge.' (footnotes omitted))."

20 So. 3d at 1270 (emphasis in original). The defendant in <u>Parr</u> attributed her delay in seeking the trial judge's recusal to her lack of awareness of the facts that had created the alleged conflict. In denying the defendant's mandamus petition, our supreme court determined that the facts of the case established that the defendant "knew or should have known," <u>id.</u> at 1270, of the facts that had led to the trial judge's alleged conflict and that the defendant had waived her right to seek the trial

judge's recusal by "inadequately explaining her delay in doing so." Id. at 1271.

Similar to Parr, in this case, the father sought Judge Booth's recusal 12 months after her assignment to the case. Unlike in Parr, the father has not provided to this court any justification for his delay in seeking Judge Booth's recusal. In fact, in his brief to this court, the father is silent to the timing of his motion seeking Judge Booth's recusal. As our supreme court determined in Parr, we find that the father waived his right to seek Judge Booth's recusal by failing to assert that claim in a timely manner and by inadequately explaining his delay in doing so.

Next, the father argues that the trial court erred by failing to disqualify the mother's attorney based on an alleged conflict of interest because, he said, the attorney had formerly represented the father in an unrelated civil matter.

Rule 1.9 of the Alabama Rules of Professional Conduct provides:

"A lawyer who has formerly represented a client in a matter shall not thereafter:

"(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the

30

> interests of the former client, unless the former client consents after consultation; or
>
> "(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 [of these Rules] would permit or require with respect to a client or when the information has become generally known."

Our supreme court has previously held:

> "A former client seeking disqualification for the conflict addressed in Rule 1.9[, Ala. R. Prof. Cond.,] must demonstrate (1) that it 'had an attorney-client relationship with the attorney the former client seeks to disqualify and [(2)] that the attorney represented the former client in a [(3)] substantially related matter.'"

Ex parte Tiffin, 879 So. 2d 1160, 1165 (Ala. 2003) (quoting Ex parte Intergraph Corp., 670 So. 2d 858, 860 (Ala. 1995)).

In his brief to this court, the father argues that the mother's counsel had previously represented him in a "civil matter" in 2021 and that, as part of his representation, the mother's attorney had obtained "intimate details of the [father's] business relationships and income." The father's brief, p. 8. The father posits that those facts satisfy each of the three elements that a former client must establish when seeking disqualification under Rule 1.9. See Tiffin, supra.

31

The mother, in her brief to this court, concedes that, in October 2021, her counsel had written a letter on the father's behalf to the father's brother regarding a dispute over a lease, but denies that that letter was substantially related to the current action because, she says, "[i]ssues with a lease would in no way necessitate the level of disclosures of business finances and relationships as is alleged by the [f]ather."  The mother's brief, p. 12.  Further, the mother argues that the father has "failed to meet his burden by failing to produce any evidence that proves [her] counsel did, in fact, have prejudicial information and significantly represented the [f]ather's adverse interests in a substantially related matter."  The mother's brief, p. 12.

The supreme court has previously held that

"'[t]he substantial relationship test is the keystone of the law on conflicts of interests involving former clients.' 1 Lawyers' Manual on Professional Conduct (ABA/BNA) 51:221 (2004) (hereinafter 'Lawyers' Manual'). '[T]he test entails inquiry into the similarity between the factual situations, the legal issues posed, and the nature and extent of the attorney's involvement to see if information from the prior representation is material to the new representation.' Lawyers' Manual 51:225. See also Ex parte State Farm Mut. Auto. Ins. Co., 469 So. 2d 574, 575-76 (Ala. 1985). The Comment to Rule 1.9 states:

> "'The scope of a "matter" for purposes of paragraph (a) may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. On the other hand, a lawyer who recurrently handled a <u>type</u> of problem for a former client is not precluded from later representing another client in a wholly distinct <u>problem of that type</u> even though the subsequent representation involves a position adverse to the prior client.... The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a <u>changing of sides</u> in the matter in question.'"

<u>Ex parte Regions Bank</u>, 914 So. 2d 843, 848 (Ala. 2005).

Initially, we note that the record on appeal contains evidence that establishes that the father had had an attorney-client relationship with the mother's counsel and that the mother's counsel had previously represented the father. <u>See</u> <u>Tiffin</u>, <u>supra</u>. The issue, therefore, is whether the mother's counsel's drafting of a letter pertaining to issues between the father and his brother regarding the father's intent not to renew a lease is "substantially related" to the current child-custody matter. <u>Id.</u>

Regarding the factual similarities between the current child-custody matter and the lease-renewal issue, the record on appeal does not contain evidence establishing that the operative facts of those two matters are substantially related. See Regions Bank, supra. Likewise, the legal issues germane to those two actions seem widely divergent. Id. It is undisputed that the nature and extent of the mother's counsel's previous legal work for the father consisted solely of his drafting a letter on the father's behalf. If, however, as the father avers, the mother's counsel received information regarding the father's "personal and business interests" and the income derived therefrom, that information would be material to the attorney's representation of the mother in a child-custody matter in which child support is at issue.

Presuming, without deciding, that, as part of his previous representation of the father, the mother's counsel had, in fact, received confidential information regarding the father's income, under the particular facts of this case, we conclude that the mother's counsel would not be disqualified from his current representation of the mother by Rule 1.9. The mother's counsel's previous representation of the father occurred in October 2021. According to the father's testimony, at that

time he had an ongoing business restoring automobiles and selling them for profit. However, the father testified that his employment status had changed two years before the November 2023 trial, i.e., in November 2021, when he said, he had ceased his automotive restoration business. Thus, any information regarding the father's income obtained in October 2021 would have become irrelevant upon the father's ceasing those income- producing activities the following month. Additionally, regarding information allegedly disclosed to the mother's counsel regarding the father's "business relationships," at trial, the father testified that he had no ongoing business dealings. Thus, any information regarding the father's "business relationships" in 2021 was also irrelevant by the time of the trial.

Next, the father argues that the guardian ad litem erred when she failed to disqualify herself. In his brief to this court, the father fails to direct this court to any authority to support his argument. Rule 28(a)(10), Ala. R. App. P., requires an appellant who is arguing that a trial court has committed a reversible legal error to present this court with relevant legal authority showing that error and that, if the appellant fails to do so, the appellant waives the argument. See Moore v.

35

Prudential Residential Servs. Ltd. P'ship, 849 So. 2d 914, 923 (Ala. 2002).

This court has no duty to "address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument." Dykes v. Lane Trucking, Inc., 652 So. 2d 248, 251 (Ala. 1994) (declining to consider argument that employment-at-will doctrine violated Equal Protection Clause of Fourteenth Amendment to the United States Constitution because argument was unsupported by any relevant legal authority). Accordingly, we do not further consider the father's argument on this issue.

Next, the father argues that the trial court erred in calculating the father's child-support obligation by not deducting his ordinary and necessary business expenses from his self-employment income. We agree.

This court has previously held that,

"[u]nder the well-established ore tenus rule, the trial court's judgment is presumed correct; this court will not reverse the judgment absent a showing that the trial court's findings are plainly and palpably wrong or that the trial court abused its discretion. Tompkins v. Tompkins, 843 So. 2d 759, 764 (Ala. Civ. App. 2002). Moreover, matters relating to child support 'rest soundly within the trial court's discretion, and will not be disturbed on appeal absent a showing that the

36

ruling is not supported by the evidence and thus is plainly and palpably wrong.' Bowen v. Bowen, 817 So. 2d 717, 718 (Ala. Civ. App. 2001)."

Scott v. Scott, 915 So. 2d 577, 579 (Ala. Civ. App. 2005).

The trial court's amended judgment awarded the mother $1,102 per month in child support. A Form CS-42 Child Support Guidelines form ("the CS-42 form") included in the record on appeal indicates that the mother's monthly gross income was $2,881 per month and that the father's monthly gross income was $6,800.[4]

The father testified that he receives $6,500 per month in rental income for a building that he owns and an additional $300 per month from Lamar Advertising for signage located on the same property. He further testified that he incurs $4,223 in monthly expenses associated with the building, including a $3,750 monthly mortgage payment, $167.75 per month for flood insurance, and $303.25 per month for property taxes. In his brief to this court, he argues that his $4,223 in monthly expenses are ordinary and necessary expenses and, therefore,

---

[4]The CS-42 form was prepared by the mother's counsel; however, it is evident that the trial court adopted those calculations in setting the father's monthly child-support obligation.

that the trial court erred when it failed to deduct those expenses from his gross receipts to calculate his monthly gross income for child-support purposes.

Rule 32(B)(3), Ala. R. Jud. Admin., provides:

"Self-employment income.

"(a) For income from self-employment, rent, royalties, proprietorship of business, or joint ownership of partnership or closely held corporation, 'gross income' means gross receipts minus ordinary and necessary expenses required to produce this income, as allowed by the Internal Revenue Service, with the exceptions noted in subsection (B)(3)(b).

"(b) 'Ordinary and necessary expenses' does not include amounts allowable by the Internal Revenue Service for the accelerated component of depreciation expenses, investment tax credits, or any other business expenses determined by the court to be inappropriate for determining gross income for purposes of calculating child support."

We disagree with the trial court's implicit determination that mortgage payments, flood-insurance premiums, and property taxes associated with the building are not ordinary and necessary expenses that are appropriate for determining the father's gross income for child-support-calculation purposes. See Rule 32(B)(3)(b). Accordingly, we reverse the trial court's amended judgment ordering the father to pay the

38

mother $1,102 in monthly child support and remand the case for the recalculation of the father's monthly child-support obligation in accordance with this opinion. Further, because we are reversing the amended judgment for the recalculation of the father's monthly child-support obligation, we also reverse the amended judgment to the extent that it awarded the mother retroactive child support and remand this matter for the recalculation of the amount the father owes in retroactive child support.

The father further argues, albeit in different terms, that the trial court erred when it amended the custody and visitation provisions of the original judgment following a postjudgment hearing.

> "[An appellate c]ourt reviews a trial court's rulings on postjudgment motions to determine whether the trial court exceeded its discretion. See Flagstar Enters., Inc. v. Foster, 779 So. 2d 1220, 1221 (Ala. 2000).
>
>> "'Whether to grant or deny a postjudgment motion filed pursuant to Rule 59[, Ala. R. Civ. P.,] is within the sound discretion of the trial court. Flagstar Enters., Inc. v. Foster, 779 So. 2d 1220 (Ala. 2000). We will not disturb the exercise of that discretion unless the trial court exceeded the permissible limits of its discretion. Flagstar, 779 So. 2d at 1221; Comalander v. Spottswood, 846 So. 2d 1086 (Ala. 2002).'"

> "Borders v. City of Huntsville, 875 So. 2d 1168, 1176 (Ala. 2003). 'Abuse of discretion by a trial court in granting a Rule 59(e) motion can be found only where a legal right was abused and the record plainly and palpably shows the trial court was in error.' Lockhart v. Phenix City Inv. Co., 488 So. 2d 1353, 1354 (Ala. 1986)."

Chapman v. Smith, 893 So. 2d 293, 295 (Ala. 2004).

The father challenges the "court's ability to unilaterally amend its visitation award when no new evidence was presented following the final trial." The father's brief, p. 12. Motions filed pursuant to Rule 59, Ala. R. Civ. P., specifically allow a trial court, sitting without a jury, to reconsider the evidence upon which it based its judgment or to rehear arguments regarding the legal considerations underlying that judgment. See Lawrence v. Lawrence, 117 So. 3d 723, 727 (Ala. Civ. App. 2013). However, a trial court is not limited to considering only those arguments advanced to it in a postjudgment motion.

> "Although a trial court generally loses jurisdiction to amend its judgment 30 days after the entry of judgment (see Ex parte Owen, 420 So. 2d 80, 81 (Ala. 1982)), a trial court retains the power to correct sua sponte any error in its judgment that comes to its attention during the pendency of a party's Rule 59(e) motion to alter, amend, or vacate the judgment, regardless of whether the error was alleged or not alleged in the motion. See, e.g., Varley v. Tampax, Inc., 855 F.2d 696, 699 (10th Cir. 1988); Charles v. Daley, 799 F.2d 343,

40

347 (7th Cir. 1986); <u>Arnold v. Sullivan</u>, 131 F.R.D. 129, 133 (N.D. Ind. 1990)."

<u>Henderson v. Koveleski</u>, 717 So. 2d 803, 806 (Ala. Civ. App. 1998). Thus, we find no merit on this point.

We further reject the father's complaint that the trial court's amendments to its judgment were not supported by "new evidence … presented following the final trial." The father's brief, p. 12. The presentation of "new evidence" is not proper in postjudgment proceedings. <u>See</u> <u>Marsh v. Smith</u>, 67 So. 3d 100, 107- 08 (Ala. Civ. App. 2011) (quoting <u>Bates v. State</u>, 503 So. 2d 856, 85 8 (Ala. Civ. App. 1987)) (explaining that " '[r]elief is barred when it is based on [new] evidence because trials would have the potential to become never-ending' ").

Lastly, to the extent the father argues that awarding the mother sole physical custody of the child violated his "constitutional right to make decisions for the child," we disagree. The father's brief, p. 14-15. Pursuant to Ala. Code 1975, § 30-3-151(2), the trial court "<u>may</u> designate one parent to have sole power to make certain decisions while both parents retain equal rights and responsibilities for other decisions." (Emphasis added.) Accordingly, we conclude that the

trial court did not exceed its discretion in designating which parent would have final decision-making authority on issues regarding the child.

## Conclusion

For the foregoing reasons, we reverse the trial court's amended judgment insofar as it failed to deduct the father's ordinary and necessary business expenses from his self-employment income for purposes of calculating the father's monthly child-support obligation and insofar as it calculated the amount of the father's retroactive child-support obligation, and we remand the case for the entry of a judgment consistent with this opinion. We affirm all other aspects of the trial court's amended judgment.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Moore, P.J., and Hanson and Fridy, JJ., concur.

Lewis, J., recuses himself.

42